Filed 9/8/14  Pan v. Carroll CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TONY PAN et al., | B250884 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC499909) |
| v. | |
| BROOK J. CARROLL et al., | |
| Defendants and Respondents. | |

APPEALS from orders of the Superior Court of Los Angeles County, Michael L. Stern, Judge.  Affirmed.

Chapin Fitzgerald, Kenneth M. Fitzgerald, Curtis G. Carll and Douglas J. Brown for Plaintiffs and Appellants.

Jampol Zimet, Alarn R. Jampol and Jose R. Gonzalez for Defendants and Respondents Brook J. Carroll and Hathaway Perrett Webster Powers Chrisman & Gutierrez, P.C.

Hunt Ortmann Palffy Nieves Darling & Mah and Omel A. Nieves for Defendants and Respondents Shaul Dina, Jianyo Li, Li Liu and Dunhua City Jisen Wood Industry Co., Ltd.

Joel Mark for Defendant and Respondent Nordman Cormany Hair & Compton, LLP.

## INTRODUCTION

In this appeal, we affirm orders granting special motions to strike a complaint for malicious prosecution pursuant to the anti-SLAPP statute, Code of Civil Procedure section 425.16.[1] As we explain, we conclude defendants[2] had probable cause to pursue their underlying collection action and therefore plaintiffs failed to demonstrate there was a probability they would prevail in the present malicious prosecution action.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Underlying Collection Action

#### A. *The Parties*

Dunhua City Jisen Wood Industry Co., Ltd. (Dunhua Jisen) is a Chinese-based manufacturer of hardwood products. Jianyo Li (Li) is Dunhua Jisen's largest shareholder and chief executive. Li Liu (Liu) is an employee and managing agent of Dinhua Jisen. Shaul Dina (Dina) is a hardwood vendor operating under the corporate name Old Master Products, Inc. (Old Master), which sells Dunhua Jisen's hardwood flooring products.

Tony Pan is the owner of several companies based in California that import and distribute hardwood flooring, including United Wood Floor Corporation (UWFC). Alice

---

[1] "SLAPP" is an acronym for "strategic lawsuit against public participation." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85 & fn. 1.)
All subsequent undesignated statutory references are to the Code of Civil Procedure.

[2] Defendants in this litigation were plaintiffs in the underlying collection action, and plaintiffs in this litigation were defendants in the underlying action.

Pan is Tony Pan's wife, and a cofounder, officer, and director of UWFC.[3]  Prior to the transactions at issue, Pan had purchased hardwood flooring products from Dunhua Jisen.

Mike Yu (Yu) is a hardwood distributor who also purchased hardwood flooring products from Dunhua Jisen.  Pan and Yu often engaged in business deals together, sometimes using similar company names.  For example, Tony operated a company using the name "Omni Wood Product, Inc.," and Yu operated a company called "Omni Wood Products, LLC."

Attorney Brook Carroll (Carroll) had represented Dina and Old Master in various matters in the past.  In April 2009, Carroll assisted in the formation of a shell company in California called Dunhua Hardwood Collection, LLC (Dunhua Collection), to which Dunhua Jisen assigned the claims (described below) that form the basis of the underlying action against Pan.  Dina was made the principal officer of Dunhua Collection.  In May 2009, while a partner at Nordman Cormany Hair & Compton, LLP (the Nordman firm), attorney Carroll filed *Dunhua Hardwood Collection, LLC v. United Wood Floor Corporation et al.*, Los Angeles Superior Court Case No. SC103286, on behalf of Dunhua Collection (the underlying action).  In April 2011, Carroll changed law firms and substituted his new law firm, Hathaway Perrett Webster Powers Chrisman & Gutierrez, P.C. (the Hathaway firm) for the Nordman firm.

### B.     *The Subject Matter of the Collection Action*

In 2007, Yu ordered 20 containers of hardwood flooring product worth about $1 million from Dunhua Jisen.  Dunhua Jisen manufactured the 20 containers but initially refused to ship them because Yu was in arrears on other payments he owed to Dunhua Jisen.

---

[3]     We hereafter refer to Tony Pan, Alice Pan, and UWFC collectively as Pan, unless it is necessary to differentiate among them.  When Tony Pan and Alice Pan are referred to individually, we use their first names, with no disrespect intended.

According to Li, Dunhua Jisen's chief executive, he and Tony attended a trade show in Las Vegas in January 2008 and discussed the 20 containers of hardwood, which Tony said he could sell. Dunhua Jisen wanted to rid itself of the 20 containers, and Li requested that Tony help find buyers. In March 2008, Tony visited China and inspected the 20 containers, telling Li he had already sold six or seven containers. Tony agreed to loan Yu the ocean freight and customs duties for the shipment; Tony's account with Dunhua Jisen would be credited in that amount.

Li visited Los Angeles in April and May 2008 to discuss the 20 containers with Yu and Tony. He also discussed Dunhua Jisen's ongoing payment disputes with Yu. Tony had not in fact sold six or seven containers. Li, Yu, and Tony agreed that Tony would try to find buyers for the hardwood and would receive a commission for any amounts obtained over $14 per square meter.

As Li was leaving Los Angeles, he and Yu apparently reached a different agreement, having settled their disputes, and decided to handle the 20 containers without Pan's involvement. They memorialized this agreement in a writing (the LAX agreement) dated May 6, 2008. Li's understanding was that the LAX agreement would not be binding unless it was signed by Tony, and it never was.

According to Tony, his involvement with the 20 containers ended there. According to Dunhua Jisen, however, Tony and Yu engaged in a scheme in which they sold the 20 containers and retained all of the proceeds.

In April 2009, Dunhua Jisen sent Pan a demand for full payment for the 20 containers. On May 27, 2009, Dunhua Collection (the assignee of Dunhua Jisen) filed a collection action against Pan and UWFC (erroneously sued as Omni Wood Product). Eventually Dunhua Collection amended its complaint to allege causes of action for breach of contract, open book account, account stated, goods sold and delivered, and fraud, and to add as defendants Yu and various alleged alter ego corporations. Dunhua Collection alleged that Pan and Yu were engaged in a joint venture to purchase 20 containers of hardwood products for which they were jointly responsible for payment of $1,170,263.

4

After a bench trial, the court entered a statement of decision in September 2011, ruling in favor of Pan on all causes of action.[4]  The court found in favor of Dunhua Collection and against Omni, LLC (Yu's corporation) as to the causes of action for breach of contract and goods sold and delivered.

## II.    The Present Malicious Prosecution Action and the Anti-SLAPP Motions

In January 2013, Pan filed the present action for malicious prosecution against Dunhua Jisen, Li, Liu, Dina, and attorney Carroll and the Nordman and Hathaway law firms (sometimes collectively referred to hereafter as defendants).[5]  Pan alleged the defendants engaged in a malicious scheme to collect nearly $1 million from Pan for the 20 containers of hardwood flooring that defendants knew Pan never ordered, received, possessed, or sold by knowingly attempting to make Pan liable for what defendants knew was Yu's debt.  Pan alleged that the defendants' fabricated version of events, based almost solely on their own false testimony, was contradicted and disproved by their own documents.  According to Pan, the attorneys prosecuting the underlying collection case ignored the dispositive documents and continued to prosecute the case.

In March 2013, attorney Carroll and the Hathaway firm filed an anti-SLAPP motion, as did the Nordman firm and Dina.  The trial court granted the motions in June 2013 (collectively referred to as the June 2013 motions).

Dunhua Jisen, Li, and Liu filed their anti-SLAPP motion in October 2013, and the trial court granted it in November 2013 (the November 2013 motion).

Pan filed a timely notice of appeal as to the order granting the June 2013 motions (case No. B250884).  Pan also timely appealed from the order granting the November

---

[4]    UWFC filed a cross-complaint against Dunhua Collection, but dismissed the cross-complaint during trial.

[5]    Pan also asserted a cause of action for libel per se against the attorney defendants, but that claim was later dismissed.

2013 motion (case No. B252414). We granted Pan's motion to consolidate the two matters.

## DISCUSSION

### I.     The Applicable Law

#### A.     The Anti-SLAPP Law

The anti-SLAPP statute allows a court promptly to dismiss unmeritorious actions or claims that are brought to chill another's valid exercise of his or her constitutional rights of freedom of speech and petition for the redress of grievances. (§ 425.16, subd. (a); see *Mann v. Quality Old Time Service*, *Inc.* (2004) 120 Cal.App.4th 90, 102.) The statute requires a two-step analysis. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.) As stated in the language of the anti-SLAPP statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The Legislature has mandated that the provisions of section 425.16 must be construed broadly. (§ 425.16, subd. (a); *Jarrow Formulas*, *Inc. v. LaMarche* (2003) 31 Cal.4th 728, 735.)

An order granting or denying an anti-SLAPP motion is reviewed de novo. (*Cole v. Patricia A. Meyer & Associates*, *APC* (2012) 206 Cal.App.4th 1095, 1105.) We apply the same two-step procedure as the trial court. (See, e.g., *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1651-1652.) Here, Pan concedes that the malicious prosecution claims against defendants arise from constitutionally

6

protected activity, and thus we need not discuss the first step of the analysis. We proceed to the second step, i.e., Pan's likelihood of prevailing on the merits of the malicious prosecution claim.

At the second step of the anti-SLAPP procedure, the plaintiff must show that he or she has a "reasonable probability of prevailing, not prevailing by a preponderance of the evidence. For this reason, a court must apply a 'summary-judgment-like' test [citation], accepting as true the evidence favorable to the plaintiff and evaluating the defendant's evidence only to determine whether the defendant has defeated the plaintiff's evidence as a matter of law. [Citation.] A court may not weigh credibility or compare the weight of the evidence. The court's single task is to determine whether the plaintiff has made a prima facie showing of facts supporting his or her cause of action. [Citation.]" (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 444.)

Here, we must determine whether the Pan malicious prosecution claim "lacks even minimal merit." (*Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 89.) Pan bears the burden of proving that there is a probability of prevailing. "In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must "'state[] and substantiate[] a legally sufficient claim.'" (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, quoting *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 412.) Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' (*Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 548; accord, *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 274.) In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. (*Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1365.)" (*Wilson v.*

*Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821, superseded by statute on other grounds as stated in *Hutton v. Hafif* (2007) 150 Cal.App.4th 527.)

>
> B.       *Probability of Prevailing on the Merits of a Malicious Prosecution Action:*
> *Probable Cause to File and Maintain the Collection Action*

Although a plaintiff opposing an anti-SLAPP motion must overcome a relatively low barrier by demonstrating that his or her cause has only "minimal merit," it is also true that malicious prosecution actions are generally disfavored because of the danger that they may chill petition and speech activity. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 872-874.) "To prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal determination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice. [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292 (*Soukup*).) It is clear the underlying action was terminated favorably to Pan. We therefore focus on the probable cause element as we find its resolution to be dispositive of this appeal.[6]

"The question of probable cause is 'whether, as an objective matter, the prior action was legally tenable or not.'" (*Soukup*, *supra*, 39 Cal.4th at p. 292.) "Probable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed. '[T]he standard of probable cause to bring a civil suit [is] equivalent to that for determining the frivolousness of an appeal [citation], i.e., probable cause exists if "any reasonable attorney would have thought the claim tenable." [Citation.] This rather lenient standard for bringing a civil action reflects "the important public policy of avoiding the chilling of novel or debatable

---

[6]      At appellants' counsel's request by letter brief dated August 28, 2014, we have considered a recent decision, *Parrish v. Latham & Watkins* (Aug. 27, 2014, B244841) ___ Cal.App.4th ___ [2014 Cal.App. LEXIS 776], which reversed the trial court's grant of an anti-SLAPP motion in a malicious prosecution action. As we do not find the issues discussed in that decision to be relevant here, we do not address it.

legal claims." [Citation.] Attorneys and litigants . . . "'have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . .'" [Citation.] Only those actions that "'"any reasonable attorney would agree [are] totally and completely without merit'" may form the basis for a malicious prosecution suit. [Citation.]' [Citation.]" (*Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1047-1048.) "'A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him.' [Citation.]" (*Soukup*, *supra*, 39 Cal.4th at p. 292.)

"The crucial issue in determining lack of probable cause is the information possessed by the attorney and/or client at the time the suit is filed, and throughout the lawsuit." (*Roger Cleveland Golf Co., Inc. v. Krane & Smith, APC* (2014) 225 Cal.App.4th 660, 686.) "To make a prima facie case of a lack of probable cause in response to the anti-SLAPP motion, [the plaintiff] must submit substantial evidence showing no reasonable attorney would have thought the [prior] action was tenable in light of the facts known . . . at the time the suit was filed [citations], or that [the plaintiffs] continued pursuing the lawsuit after they had discovered the action lacked probable cause." (*Mendoza v. Wichmann* (2011) 194 Cal.App.4th 1430, 1449 (*Mendoza*), citing *Zamos v. Stroud* (2004) 32 Cal.4th 958, 966-970.) "'Only those actions that any reasonable attorney would agree are totally and completely without merit may form the basis for a malicious prosecution suit. [Citations.]'" (*Mendoza*, *supra*, at p. 1449.)

Whether a reasonable attorney would have thought the claim legally tenable is a legal issue. (*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP* (2010) 184 Cal.App.4th 313, 333.) This legal question is to be determined on the basis of whether *as an objective matter*, the prior action was legally tenable. (*Ibid.*, italics added.)

## II. Defendants Had Probable Cause to Pursue the Underlying Action

### A. Pan's Arguments Regarding Lack of Probable Cause to Bring the Underlying Collection Action

Pan points to purportedly "unambiguous evidence" showing that he was not liable for the 20 containers of hardwood, which he argues the defendants knew about throughout the litigation. That evidence consists in substance of the following. Yu's company paid its delivery agent to ship the 20 containers, which were stored in a warehouse exclusively leased and controlled by Yu. The LAX agreement, attached as an exhibit to Dunhua Jisen's complaint in the underlying collection action, stated in relevant part: "With regard to the handling of the 373 pallets of compound flooring stored at Rider Express, the disposition shall be as follows: [¶] . . . Mr. Li Jianyou, representing [Dunhua Jisen], decides to handle all the inventory directly. *Thanks to Mr. Tony's previous help in this regard.* President Li has divided all the goods into two parts, effective immediately, and that all the goods with the mark of Garrison (totaling 147 pallets) shall be sold to Party C [Mike Yu], with unit price of $20/square meter. . . . The remaining 229 pallets of goods shall belong to Mr. Li and be handled by himself (who shall have the complete authority to dispose of the goods). *Mr. Tony's work will be terminated from now on and he shall have no relationship whatsoever with this transaction any more effective immediately.* [¶] . . . [¶] *Mr. Tony's advance payment will be deducted by Jisen*[.]"[7] (Italics added.) The "help" from Pan was his payment of the ocean freight and customs duty on the shipment, for which he was reimbursed.

---

[7] The translation admitted into evidence at trial contained different wording for the three sentences italicized above. Instead, those sentences read: "[T]hanks Mr. Tony for his passionate help (freight expenses, custom clearance, etc.)." "The job of Mr. Tony has ended as of now, and this deal has no relationship with him whatsoever from now on." "The sea freight, land fr[e]ight, and customs expenses paid by Mr. Tony for Jisen shall be deducted from the Jisen loan with photocopies of the documents."

We note the alternative spelling of Li's name in the translated document.

Dunhua Jisen shipped the containers "FOB Dalian to OMNI WOOD ROODUCT [*sic*]."[8] Between March 2008 and August 2008, Yu paid his U.S. delivery agent to have the containers delivered to a warehouse rented and controlled exclusively by Yu.

An agreement entered into in June 2008 by Yu and Li, introduced at trial, provided that Yu was to purchase 19 and one-half of the 20 containers and set forth a payment schedule Yu was to follow. Statements of account from Dunhua Jisen to Pan in October 2008 and February 2009 made no reference to Pan owing anything for the 20 containers.

The defendants produced no purchase order, written contract, confirmation letter, written payment demand between Dunhua Jisen and Pan (prior to the one sent a month before the underlying action was filed), or documentary proof reflecting a sale of any of the products in the 20 containers by Pan. Pan asserts that the trial court found only that the *testimony* was conflicting, not the documentary evidence.

### B. Evidence and Inferences Showing Probable Cause to Pursue the Underlying Action

In moving to dismiss the malicious prosecution action pursuant to the anti-SLAPP statute, defendants asserted that they had probable cause to file and maintain the underlying action. The collection action was based on a theory that Yu and Pan acted as partners, joint venturers, or alter egos with respect to the purchase and sale of the 20 containers pursuant to an oral agreement.

Defendants presented undisputed evidence that Pan and Yu were extensively involved in joint business dealings and operated businesses with substantially similar names. Yu testified at trial in the underlying action, again without dispute, that Pan and Yu kept a running ledger of all of their shared business transactions, which were numerous and long-standing. Yu testified that Alice handled the finances among them,

---

[8] As explained by the trial court in its statement of decision, "FOB Dalian" meant that Dunhua Jisen delivered the product to the Dalian port in China and the purchaser was responsible for paying shipping and customs costs.

11

and that Yu and Pan exchanged detailed monthly accounting and reconciliation statements.

Pan and Yu both operated businesses containing the words "Omni Wood" in the name. They both operated businesses at 18025 Cortney Court in the City of Industry. Tony testified that he and Yu shared this address from 2005 until 2009. Tony confirmed at trial that United Wood and Omni Wood Product, *Inc.* were "all his company." An October 2008 letter produced at trial demonstrated he communicated with Dunhua Jisen about the 20 containers on letterhead bearing the Omni Wood name. Alice signed dissolution papers for a corporation identified as "Omni Wood Products, Inc." in December 2008. Tony testified Omni Wood Products, *LLC* was Yu's company. The invoices for the 20 containers were addressed to "Omni Wood Rooduct [*sic*]."**9**

After completing the bench trial, the underlying trial court ruled that "Dunhua [Jisen] has failed to meet its burden of proving that Pan Defendants are alter egos of Mike [Yu] or Omni, LLC insofar as they have not met their burden of proving that there is such a unity of interest between them that their separate personalities no longer exist and that an inequitable result would follow if their purported separateness was not set aside. [Citation.]" However, a finding that Dunhua Jisen failed to meet the burden of proof does not mean there was no evidence to support bringing the claim. Indeed, Dunhua Jisen presented substantial evidence at trial that supported an inference that the companies owned by Yu and Pan were joint venturers or alter egos. The evidence was sufficient to show that reasonable attorneys would pursue that theory of recovery.

---

**9**    The attorney defendants state the invoices said "'Omni Wood Rooduct [*sic*], *located at 18025 Cortney Cowrt* [*sic*]*, City of Industry CA 91748*.'" (Italics added.) Carroll stated in his declaration that the invoices were admitted at trial as exhibits 23-29. However, the invoices were not attached to the Carroll declaration and apparently are not included in the record on appeal.

Li testified at deposition that he had been to Pan's office, that he understood Pan's company's name was something like "Oming," "the company that I delivered the containers to," and that Pan's business was a warehouse with the street numbers "1825" in the address.

Li testified that he and Tony had entered into an oral agreement in Las Vegas in January or February 2008 that Pan would purchase the 20 containers and would have two months to pay for them at normal prices. Tony denied discussing the 20 containers with Li in Las Vegas. The underlying trial court found "the testimony of Li, Mike [Yu], and Shaul Dina less credible than the testimony of Tony." However, that discussion was not the only evidence supporting the oral agreement on which the collection action was founded.

Li testified that he again met with Tony at Dunhua Jisen's Chinese factory in March 2008, before Dunhua Jisen shipped the products. Li testified that Tony told him that he had already sold six to seven containers. Li said that Tony agreed to take delivery, sell the products, and pay Dunhua Jisen.

The parties did not dispute that in April 2008, Li traveled to Los Angeles and met with Yu and Tony to discuss disposition of the containers. The underlying trial court found, "*While there was conflicting evidence* regarding what was said at that meeting, . . . the court finds that Tony was . . . asked if he would identify customers for the products. It was agreed that if Tony would agree to find customers to buy the products and paid the $120,000 in shipping costs for the 20 containers, he would have the exclusive right to sell the products and would receive as compensation any amounts received above the invoice price of $14 per square meter." (Italics added.)

Also undisputed was the existence of the May 2008 written LAX agreement. Tony testified that he spoke to Li and Yu over the telephone at the time they were making the LAX agreement, and was "shocked" that they were kicking him out of the deal, which was evidence that Tony considered himself to be part of the deal. In addition, Li testified to his belief that the LAX agreement was not valid because Tony had not signed it. Indeed, in UWFC's third amended cross-complaint against Dunhua Jisen, Yu, and Yu's companies (which was voluntarily dismissed during the underlying trial), UWFC alleged that the oral agreement—by which the parties agreed Pan would have the exclusive right to sell the products—remained in place after Tony refused to sign the LAX agreement. UWFC alleged that Dunhua Jisen and Yu thereafter made oral

13

assurances that the oral contract remained in place, even after the LAX agreement was written. These statements made in the cross-complaint constituted judicial admissions which, while not "set in stone" (see *Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 451-452 & fn. 2), provide support for the conclusion that Dunhua Jisen's underlying complaint was far from frivolous. Similarly, Tony stated at deposition that he indeed continued to try to sell some of the 20 containers but was not successful.

In addition, the documentary evidence confirmed that the LAX agreement did *not* terminate Tony's involvement. Even after knowing about the LAX agreement, Tony wire-transferred the money for the shipping and customs duty for the 20 containers.

On June 5, 2008, Dunhua Jisen notified Pan in writing that Yu would handle the 20 containers, and he set forth the terms of that arrangement. Dunhua Jisen also sent a written agreement to Yu, which Yu signed, setting forth the terms of the agreement by which Yu would have full discretion to sell the product. *Tony was copied on this agreement*. It is undisputed, however, that Yu did not comply with the conditions of the agreement that required him to pay Dunhua Jisen $200,000 within one week and pay the remainder of the contract price by October 2008.

Because of this competing evidence and notwithstanding the language of the LAX agreement, a full bench trial was needed to determine the merits. This is not a case where there were no facts supporting Dunhua Jisen's claim, and there was substantial undisputed evidence that at least created inferences that there was an oral agreement and a joint venture between Pan and Yu relating to the 20 containers. Even though many of the documents supported a finding that Pan was not liable, the underlying action was not frivolous or brought without probable cause as to Pan.

A review of the record leads us to conclude that Pan did not make a prima facie case of a lack of probable cause in response to the anti-SLAPP motion because Pan did not submit evidence showing that no reasonable attorney would have thought the prior action was tenable in light of the known facts. Defendants' case against Pan was not "'totally and completely without merit.'" (*Mendoza*, *supra*, 194 Cal.App.4th at p. 1449.) Thus, we conclude that Pan did not demonstrate a reasonable probability of prevailing

14

against defendants on the malicious prosecution claim.  Accordingly, the anti-SLAPP motions were properly granted and the complaint properly dismissed as to all defendants.[10]

## DISPOSITION

The orders granting the anti-SLAPP motions are affirmed.  Costs on appeal are awarded to defendants.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, J.[*]

We concur:

WILLHITE, Acting P. J.

MANELLA, J.

---

[10]     Because we find dispositive Pan's failure to demonstrate a reasonable probability of prevailing on the merits of the malicious prosecution action, we need not discuss whether Pan demonstrated the existence of malice.  Similarly, we need not consider the Nordman firm's contention that Pan's complaint against it was untimely.

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.